IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MARCELA OLVERA-MORALES, on behalf of herself and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:05CV00559 |
| INTERNATIONAL LABOR MANAGEMENT CORPORATION, INC.; NORTH CAROLINA GROWERS ASSOCIATION, INC.; and DEL-AL ASSOCIATES, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION

TILLEY, District Judge

This case arises out of a dispute concerning the recruitment of temporary foreign workers pursuant to the H-2A and H-2B visa guest worker programs. The matter is now before the Court on Defendants' Motions for Summary Judgment. For the reasons set forth below, International Labor Management Corporation, Inc. ("ILMC") and North Carolina Grower's Association, Inc.'s ("NCGA") Motion for Summary Judgment [Doc. # 101] on the Title VII claims is GRANTED as to ILMC, and those claims are DISMISSED. ILMC and NCGA's Motion for Summary Judgment [Doc. # 101] on the Title VII claims is DENIED as to NCGA. Del-Al Associates, Inc.'s ("Del-Al") Motion for Summary Judgment [Doc. # 98] as to the Title VII claims is GRANTED, and those claims are DISMISSED. The Court declines

to exercise supplemental jurisdiction over the claims pursuant to the New York

Human Rights Law, and those claims are DISMISSED WITHOUT PREJUDICE.

I.

The H-2A and H-2B visa guest worker programs provide a legal means by

which foreign workers can obtain temporary unskilled employment in the United

States.  The H-2A program authorizes the seasonal employment of foreign workers

under specified conditions to perform agricultural work, such as planting, weeding,

harvesting, and related tasks.  The H-2B program authorizes the employment of

foreign workers to perform various non-agricultural work, such as seafood

processing, landscape labor, housekeeping, and fishing.

In addition to the differing work assignments, the H-2A and H-2B programs

also confer different benefits.  The benefits associated with the H-2A visa include:

(1) a guarantee that the worker will receive 75% of the work hours promised; (2)

free housing; (3) travel reimbursement; (4) an employment contract; and (5) the

Adverse Effect Wage Rate, which insures that the presence of foreign workers

does not negatively impact wages paid to the local American workforce.  Under the

H-2B visa, on the other hand, workers are guaranteed only that their pay will be

consistent with the prevailing wage for the assigned locality.  An H-2B worker

must pay for housing and transportation and has no employment contract or work

guarantee.

Defendant ILMC is a North Carolina corporation that assists its clients in

2

locating and processing foreign workers, usually from Mexico, under the H-2A and H-2B programs. ILMC's clients consist of both agricultural and non-agricultural businesses throughout the United States. Defendant NCGA is a non-profit North Carolina corporation that assists North Carolina farm entity members in locating and processing foreign workers solely under the H-2A program. ILMC and NCGA's visa processing function focuses on the requirements from "the U.S. end." ILMC and NCGA were both founded by C. Stanford Eury and are located in Vass, North Carolina.

Defendant Del-AI is a Texas corporation located in Charlottesville, Virginia. Del-AI locates Mexican workers for its clients and processes the H-2A and H-2B visa applications from the "Mexican end." Del-AI essentially serves as a liaison between employers or associations in the United States and recruiters in Mexico. Del-AI was founded by Jorge Del Alamo and is currently run by his son, Juan Del Alamo.

The employee recruitment process generally proceeds as follows. ILMC and NCGA are contacted by its clients/members with requests for a certain number of agricultural or non-agricultural workers. After collecting all relevant information from the client/member, ILMC and NCGA advertise the positions in the applicable area within the United States. If the positions remained unfilled, ILMC and NCGA follow the procedures necessary to obtain foreign workers.

As part of this process, employer clients/members of ILMC and NCGA would

3

often request that specific workers from the prior season be rehired; these workers are called "preferred workers." ILMC and NCGA would engage Del-Al, or another third-party, to locate and recruit the needed workers. Del-Al would pass the relevant information along to recruiters in Mexico, who would attempt to locate and rehire any preferred workers and then fill any remaining positions with interested Mexican citizens.

Plaintiff Marcela Olvera-Morales, a Mexican citizen who resides in Ecatepac, Mexico, was hired to work in the United States under the H-2B visa program by agents of Del-Al on behalf of ILMC. Ms. Olvera-Morales was initially assigned to a Michigan vegetable processing company called Veg-Cut in July 1999. In November 1999, she was transferred to an onion farm and onion processing facility in upstate New York, where she worked until she was dismissed in February 2000.[1]

Ms. Olvera-Morales asserts that she was qualified to work in an H-2A position and would have preferred such an assignment because of its preferable benefits. Ms. Olvera-Morales further asserts that even though there were men with similar or lesser qualifications that were recruited by Defendants for H-2A positions, Ms. Olvera-Morales was neither offered such a position nor informed

---

[1] The New York employers consisted of Sterling Onions, Inc., Zappala Farms, LLC, Zappala Holding Company, LLC, Zappala Enterprises, Inc., and James Zappala. Each of these parties were originally named as defendants in this action, but have since been dismissed.

4

that such positions existed.

Ms. Olvera-Morales filed the instant lawsuit on December 22, 2002 in the Northern District of New York asserting violations of Title VII and the New York Human Rights Law. The case was transferred to this Court on June 15, 2005. On November 7, 2007, the Court entered an order granting Ms. Olvera-Morales' motion for class certification. [Doc. #123]. The parties have completed discovery, and the Defendants have each filed motions for summary judgment.

II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Cox, 249 F.3d at 299. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex, 477 U.S. at 322-23. In essence, summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence, and the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

5

party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

Ms. Olvera-Morales asserts that the Defendants' practice of channeling women into H-2B positions violates Title VII of the Civil Rights Act. In support of their motions for Summary Judgment, Defendants have asserted several arguments seeking dismissal of the Title VII claims. Each of these arguments will be addressed in turn.

## A.

It is well-established that in order to sustain a civil action pursuant to Title VII, a plaintiff must exhaust her administrative remedies. Specifically, Title VII requires that a claimant file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged discriminatory act or acts, or, if the alleged discrimination occurred in a "deferral state," within 300 days from the alleged discriminatory act. See 42 U.S.C. § 2000e-5(e). New York, the state in which Ms. Olvera-Morales was employed at the time she filed her EEOC charge, is a deferral state. Therefore, it was necessary for Ms. Olvera-Morales to file her EEOC charge within 300 days of the alleged discriminatory acts.

On April 26, 2000, Ms. Olvera-Morales filed two charges of discrimination with the EEOC naming ILMC as the defendant. On March 15, 2002, Ms. Olvera-Morales amended her EEOC charge to add NCGA and Del-Al as additional defendants. NCGA and Del-Al assert that Ms. Olvera-Morales did not file a timely EEOC charge against them and thus that she has failed to exhaust her

6

administrative remedies with respect to them.

Generally, failure to name a party in the EEOC charge means the plaintiff did not exhaust administrative remedies against those parties, and a district court must dismiss the case. See Alvarado v. Board of Trs. of Montgomery Cmty. Coll., 848 F.2d 457, 458-59 (4th Cir.1988); see also 42 U.S.C. § 2000e-5(f)(1) (specifying that an individual may bring an action against a party "named in the charge").

The Fourth Circuit has noted that "[c]ourts have developed exceptions to this rule, though, where it is clear that the defendant through some relationship with the named respondent had notice of the charges and participated in the conciliation process." EEOC v. Am. Nat'l Bank, 652 F.2d 1176, 1186 n.5 (4th Cir. 1981); see also Alvarado, 848 F.2d at 461 (explaining that the "Fourth Circuit has not had occasion to decide whether to adopt the substantial identity exception" but noting that the American National Bank case quoted such language "with approval . . . in dictum").

Several district courts in the Fourth Circuit have applied the "identity of interest" or "substantial identity" test set forth by the Third Circuit in Glus v. G.C. Murphy Co., 562 F.2d 880 (3d Cir.1977), to determine whether a defendant had notice of the EEOC charges and participated in the conciliation process. See, e.g., Mayes v. Moore, 419 F. Supp.2d 775, 782-83 (M.D.N.C. 2006); Jamieson v. Valle Bank, No. 7:05CV00165, 2005 WL 2233545 (W.D. Va. Sept. 13, 2005); Tietgen v. Brown's Westminster Motors, Inc., 921 F.Supp. 1495, 1498-99 (E.D.

7

Va. 1996).  The factors identified by the <u>Glus</u> court are as follows:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;

> 2) whether, under the circumstances, the interests of a named party are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;

> 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;

> 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

<u>Glus v. G.C. Murphy Co.</u>, 562 F.2d 880, 888 (3d Cir.1977).   In addition, since

<u>Glus</u> was decided, the Third Circuit has combined these four factors into a two-

factor inquiry that considers whether the unnamed party has received notice and

whether there is a shared commonality of interest between the named and

unnamed parties. <u>Schafer v. Bd. of Pub. Educ.</u>, 903 F.2d 243 (3d Cir. 1990);

<u>Goodman v. Lukens Steel co.</u>, 777 F.2d 113 (3d Cir. 1984).

1.

In this case, Ms. Olvera-Morales' H-2B visa documentation indicates that

ILMC, which was the entity named in the initial EEOC complaint, was her

employer.  Similarly, the reverse side of her I-94 departure record contains a

reference only to ILMC.  Although it is not clear from the evidence who gave these

documents to Ms. Olvera-Morales, it appears that she received them from

8

individuals contracted by Del-Al to recruit Mexican workers. [Olvera-Morales Dep. at 96]. Ms. Olvera-Morales also testified that she was not given any documents that contained a reference to Del-Al or Del-Al Associates in conjunction with receiving any of the visa documents that were contained in her passport. [Olvera-Morales Dep. at 63-65]. Similarly, Ms. Olvera-Morales testified that she did not hear Mr. Del Alamo's name until she came to Michigan. [Olvera-Morales Dep. at 61-62].

Ms. Olvera-Morales has testified that it was her understanding Mr. Del Alamo was a representative of the "North Carolina Association."[2] [Olvera-Morales Dep. at 43-44]. This understanding was based on three things. First, Ms. Olvera-Morales testified that Mr. Del Alamo's name was mentioned in conversations with her co-workers in Michigan concerning who the workers would contact if they had any problems; it was also discussed that Mr. Del Alamo was part of the "North Carolina Association." [Olvera-Morales Dep. at 46, 95].

Second, some of Ms. Olvera-Morales' co-workers gave her a card bearing both Mr. Del Alamo's name and "above it had the name of the association."

---

[2] There are repeated references throughout Ms. Olvera-Morales' deposition to the "North Carolina Association." When asked whether she was confusing the North Carolina Association with the North Carolina Grower's Association, Ms. Olvera-Morales testified "the only name I know is North Carolina Association and Jorge Del Alamo, alleged director." [Olvera-Morales Dep. at 66]. When asked if there was a connection between Del-Al and ILMC, Ms. Olvera-Morales responded: "The only thing I know that my coworkers have always referred to most of the people I've talked to that the association. I don't know the rest of the words, but just the association represents Mr. Jorge Del Alamo and the recruiters in Mexico."

9

[Olvera-Morales Dep. at 44]. Although it is not clear from the deposition testimony, it appears that this card may have been marked as Exhibit No. 3 to Ms. Olvera-Morales deposition. It does not appear that a copy of Exhibit No. 3 to Ms. Olvera-Morales deposition was provided to the Court, however, it appears that Exhibit 10 to Del-Al's deposition may be the same document that is Exhibit No. 3 to Ms. Olvera-Morales' deposition. It appears from the deposition testimony, and from viewing Exhibit No. 10 to Del-Al's deposition, that the front of the card does not contain Mr. Del Alamo's name (although the name Jorge may appear handwritten on the back of the card) but instead contains the name Del-Al Associates, Inc., as well as a phone number in San Antonio, Texas. [Olvera-Morales Dep. at 55-57, 88].

Third, Ms. Olvera-Morales testified that she received a phone number for the "North Carolina Association" when she was working in Michigan. [Olvera-Morales Dep. at 120]. When she called the number she had been given, Ms. Olvera-Morales asked to speak to Mr. Jorge Del Alamo. [Id.] The woman who answered the phone identified herself as Dora and told Ms. Olvera-Morales that Mr. Del Alamo was not there. [Id.] Ms. Olvera-Morales asked Dora if she was Mr. Del Alamo's secretary, and Dora responded that she was his secretary. [Olvera-Morales Dep. at 48]. It is not clear whether, or if, Dora identified herself as an employee of NCGA or ILMC.

Ms. Olvera-Morales called the same number six or seven times seeking

assistance with a visa extension. [Olvera-Morales Dep. at 121-23; <u>see</u> <u>also</u> Warner Dec. Ex. 16 (Olvera-Morales Aff.)]. During one of those subsequent phone calls, Dora told Ms. Olvera-Morales that she (Dora) would speak with Jorge Del Alamo about her visa extension. [Olvera-Morales Dep. at 120-23]. The phone number Ms. Olvera-Morales called was shared by NCGA and ILMC at that time. Ms. Olvera-Morales' address book, which she presented at her deposition in this matter, contained a listing for the North Carolina Association. [Olvera-Morales Dep. at 86-87]. In addition, this address book contained a listing for Jorge Del Alamo including a phone number that was not the same as the North Carolina Association number. [Olvera-Morales Dep. at 87, 119].

As to the fourth <u>Glus</u> factor, while there may be some evidence to suggest that Dora and Ms. Olvera-Morales' co-workers in Michigan represented to Ms. Olvera-Morales that Mr. Del Alamo was an employee of either ILMC or NCGA, there is no evidence that Mr. Del Alamo himself or anyone else associated with Del-Al made any representations to Ms. Olvera-Morales regarding an association between Mr. Del Alamo and either ILMC or NCGA. <u>Cf</u>. <u>Bharadwaja v. O'Malley</u>, slip op., 2006 WL 2811257, at *7 (D. Md. Sept. 27, 2006) (finding identity of interest based, in part, on evidence suggesting that the unnamed party itself may have represented to the plaintiff that its relationship with the plaintiff was through the named party). Thus, this factor weighs against a finding of identity of interest.

As to the first <u>Glus</u> factor, although Ms. Olvera-Morales has testified that it

was her belief Mr. Del Alamo worked for the "North Carolina Association," it appears that she possessed at least some documentation prior to the filing of the EEOC complaint that specifically referred to Del-Al Associates. Considering the facts in the light most favorable to Ms. Olvera-Morales, it appears that she may not have been able to determine, through reasonable efforts, Del-Al's role at the time of the filing of the EEOC complaint. In this case, however, Ms. Olvera-Morales did not prepare and file her EEOC complaint. Rather, she was represented by counsel experienced in Title VII matters. Thus, it is necessary to determine whether Ms. Olvera-Morales' counsel could have discovered the role of Mr. Del Alamo prior to the filing of the EEOC complaint. To address this issue, counsel for Ms. Olvera-Morales has submitted a declaration regarding the basis for his belief that Mr. Del-Alamo was an employee of ILMC at the time the initial EEOC complaint was filed.

In this declaration, counsel refers to deposition testimony by Ms. Olvera-Morales in June 2000 that Mr. Del Alamo worked for the "association of North Carolina." [Werner Decl. ¶ 9(A)]. Because the EEOC complaint was filed in April 2000, Ms. Olvera-Morales' testimony in June 2000, after the EEOC complaint was filed, is not relevant to a determination of what counsel knew at the time the EEOC complaint was filed. In addition, counsel points to Ms. Olvera-Morales' visa and other documentation that refers only to ILMC and states, "Ms. Olvera-Morales has indicated she received [this documentation] from Jorge Del Alamo or his agents," which "suggest[s] that Mr. Del Alamo was acting on behalf of ILMC." [Werner

12

Dec. ¶(B)].  However, Ms. Olvera-Morales' deposition testimony belies this statement; Ms. Olvera-Morales testified that she had not heard Mr. Del Alamo's name until she arrived in Michigan. [Olvera-Morales Dep. at 60-61].  Based on this testimony, it is unclear how Ms. Olvera-Morales could have "indicated" that she received her visa documents from Mr. Del Alamo, a man whose name she had not heard at the time she received those documents.  Finally, counsel cites to Plaintiffs' Interrogatory Responses, which provide that Plaintiffs were not aware of the existence of Del-Al until 2002 and also cites Del-Al's Interrogatory Responses, which indicate that Mr. Del Alamo is the president of Del-Al. [Werner Decl. ¶ 9(C), (D)].

Absent from counsel's declaration, however, is a description of the investigation counsel conducted prior to the filing of the EEOC complaint to confirm whether Mr. Del Alamo was in fact an employee of ILMC or NCGA.  For example, counsel could have called the phone number for ILMC/NCGA and asked to speak to Mr. Del Alamo and, if he was not available, inquired further as to how to contact him.  In addition, counsel could have asked the individual who answered the phone for further information about Mr. Del Alamo.  In addition, Ms. Olvera-Morales has testified that she gave the card containing a reference to Del-Al Associates to her attorneys.  On these facts, it appears that Ms. Olvera-Morales' attorney, who prepared and filed the EEOC complaint, should have been able to ascertain, through reasonable effort, that Mr. Del Alamo was not an employee or representative of

13

ILMC at the time the EEOC complaint was filed in this matter.  However, even assuming Ms. Olvera-Morales and her counsel could not have determined Del-Al's role through reasonable efforts and this factor were to weigh in Plaintiffs' favor, the remaining <u>Glus</u> factors would not support a finding of an identity of interest between ILMC and Del-Al.

With respect to the second and third <u>Glus</u> factors,, Ms. Olvera-Morales does not present any evidence in response to Del-Al's summary judgment motion that Del-Al's interests are so similar to ILMC's that it was not necessary for Del-Al to participate in the conciliation process. [See Pl.'s Consolidated Brief at 9-10 (mentioning only ILMC and NCGA when discussing the second <u>Glus</u> factor)]. Moreover, it is undisputed that Del-Al was not provided any notice of the EEOC complaint prior to the amendment that was filed by Ms. Olvera-Morales' counsel two years after the initial complaint was filed.  Although this amendment was filed before Ms. Olvera-Morales received her right to sue letter from the EEOC, it was not filed within 300 days of the last act of alleged discrimination.

Ms. Olvera-Morales has not presented sufficient evidence to establish that Del-Al had an identity of interest with ILMC for purposes of satisfying the EEOC naming requirement.  Thus, Ms. Olvera-Morales has failed to exhaust her administrative remedies as to Del-Al.  Del-Al's Motion for Summary Judgment is GRANTED, and the Title VII claims against Del-Al are DISMISSED.

2.

14

As to the relationship between ILMC and NCGA, when Ms. Olvera-Morales' original EEOC complaint was filed against ILMC, Mr. C. Stanford Eury, Jr., "was both the president of ILMC and the Executive Director of NCGA." [Eury Aff. ¶ 33]. While NCGA and ILMC are separately incorporated entities, they "share a building" and "share certain infrastructure." [Eury Aff. ¶ 4]. For example, ILMC rents the second floor of office space that is owned by NCGA, and NCGA occupies the first floor. [Defs.' Resp. Interrog. 3]. In addition, at the time at issue, NCGA and ILMC shared a telephone number, and Mr. Eury has testified that he was "not surprised to hear that an ILMC employee would have allegedly answered the telephone 'NCGA.'" [Eury Dep. at 37]. Because NCGA and ILMC shared a telephone number, it was not clear to Ms. Olvera-Morales whether she was speaking with an NCGA employee or an ILMC employee, and it appears she likely spoke to employees of both NCGA and ILMC when she was seeking assistance with her visa extension.

ILMC and NCGA, through a declaration by their counsel, assert that despite Ms. Olvera-Morales' lack of understanding of the relationship between ILMC and NCGA, Plaintiff's counsel was well aware of a relationship between NCGA and ILMC long before the amended EEOC complaint naming NCGA was filed. According to this declaration, in November 2000 – approximately 7 months after Ms. Olvera-Morales filed her initial EEOC discrimination charge and approximately 17 months before she filed the amended charge naming NCGA – counsel for Ms.

15

Olvera-Morales sent a 30(b)(6) Notice of Deposition to ILMC in another lawsuit that identified deposition topics seeking information about NCGA. NCGA asserts that this 30(b)(6) Notice demonstrates that Plaintiff's counsel was clearly aware that ILMC and NCGA were related entities.

A review of the 30(b)(6) Notice, however, does not necessitate drawing the conclusion reached by ILMC. The first topic of the 30(b)(6) Notice that mentions NCGA refers to ILMC "using the services" of NCGA. If Plaintiff's counsel was seeking information regarding ILMC's use of NCGA's services, it does not follow that Plaintiff's counsel believed ILMC and NCGA were such closely related entities that NCGA should be named in Ms. Olvera-Morales' EEOC complaint. In addition, the paragraphs of the 30(b)(6) Notice that specifically reference Ms. Olvera-Morales make no mention of NCGA and refer only to ILMC. Contrary to ILMC's assertion, it is not clear from reviewing this 30(b)(6) Notice that counsel for Plaintiff believed there was a relationship between ILMC and NCGA such that NCGA should be identified as a respondent in Ms. Olvera-Morales' EEOC complaint.

With respect to the other Glus factors, it is undisputed that NCGA and ILMC are closely related entities. In fact, at the time the EEOC complaint was filed, Mr. Eury was both the president of ILMC and the Executive Director of NCGA. NCGA asserts, however, that it did not receive notice of the EEOC charge until it received a copy of the EEOC determination letter in September 2002. [Defs.' Resp. Interrog. 7]. As a result, NCGA asserts that it was not given the opportunity to respond to

16

the EEOC charges or otherwise participate in the conciliation process. [Id.] Mr. Eury has testified that if he "had believed that NCGA would be implicated, [he] would have been deeply concerned because of the class allegations and possibly would have made dramatically different strategic decisions with respect to defense of the charges and conciliation." [Eury Aff. ¶ 33].

Given that Mr. Eury, who was both the president of ILMC and the Executive Director of NCGA, had actual notice of the EEOC charge against ILMC, it strains credibility to assert that NCGA did not have notice of the EEOC charge. Although Mr. Eury states that he "possibly would have" taken different steps to defend an EEOC charge against NCGA, he does not provide any specific details regarding how he would have defended the charges any differently and offers no concrete facts demonstrating that NCGA was in fact prejudiced by not participating in the EEOC conciliation process.

In the light most favorable to Ms. Olvera-Morales, it was not unreasonable for her to be confused about the identities of NCGA and ILMC at the time the initial EEOC complaint was filed. In addition, NCGA and ILMC have very similar interests in this litigation, and NCGA has not shown how it was prejudiced by not participating in the EEOC conciliation process. Thus, for purposes of the EEOC naming requirement, NCGA and ILMC share an identity of interest, and NCGA's motion for summary judgment is DENIED.

B.

17

ILMC has also moved for summary judgment on the ground that it is not an "employer" within the meaning of Title VII. Under Title VII, the term "employer" means "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year . . . ." 42 U.S.C. § 2000e(b).

Upon review of the pleadings in this matter, it appears that this is the first time ILMC has raised this particular argument with respect to Plaintiff's Title VII claim. ILMC's Answer denies that it is an employer, however, it does not appear that ILMC ever filed a motion to dismiss the Title VII claim on the grounds that it was not an employer under Title VII. Because the numerosity requirement is an element of the plaintiff's Title VII claim rather than an affirmative defense, ILMC may challenge this deficiency in Ms. Olvera-Morales' claim at the summary judgment stage even though it had not previously raised this argument. See Wauben v. Protega (USA), Inc., No. 2:05-2780, slip op., 2007 WL 775614, at #3-4 (D.S.C. Mar. 9, 2007) (discussing Arbaugh and holding that the defendants "did not waive the argument concerning numerosity" because the "'15 person defense' is not really a defense but is, in actuality, an element of Plaintiff's claim").

A review of the evidence in the record has identified three pieces of evidence that discuss the number of individuals employed by ILMC: (1) an Interrogatory Response; (2) Mr. Eury's Affidavit; and (3) a document listing staff of ILMC and NCGA. ILMC's Response to Plaintiff's Interrogatory Number Two lists

18

four ILMC employees in 1999 and six ILMC employees in 2000. [Defs.' Resp. Interrog. at 4]. Mr. Eury has testified by way of affidavit that ILMC had four employees in 1999 and six employees in 2000. [Eury Aff. ¶ 3]. In addition, the document separately listing ILMC and NCGA employees identifies seven employees for ILMC from September 1999 to September 2000. [Werner Dec. ex. 20].

According to this evidence, it appears ILMC never employed fifteen or more employees in each of twenty or more calendar weeks during the years 1999 and 2000. Ms. Olvera-Morales has failed to controvert this specific assertion in any of her submissions in response to ILMC's motion for summary judgment. Therefore, based on the undisputed evidence before the Court, ILMC does not qualify as an "employer" under Title VII, and therefore cannot be held liable under Title VII.

It must be noted that in addressing Defendants' argument with respect to the "identify of interest" argument regarding the timeliness of the EEOC complaint, Ms. Olvera-Morales refers to ILMC and NCGA as "closely entertwined entities" who have "acted as a single entity" with respect to defending this litigation. [Pl. Consol. Resp. at 10]. Similarly, in her Statement of Facts, Ms. Olvera-Morales describes that ILMC and NCGA are located in the same building, have the same founder, share a fax number and postage meter, and use the same employees for bookkeeping services.

However, Plaintiff has not made any argument that ILMC and NCGA should be considered an "integrated employer" or "integrated enterprise" and thus that

their employees should be combined for purposes of determining whether they have the requisite number of employees for Title VII to be applicable.  Hukill v. Auto Care, Inc., 192 F.3d 437, 442 (4th Cir. 1999) ("Under the 'integrated employer' test, several companies may be considered so interrelated that they constitute a single employer.")  Ms. Olvera-Morales does not cite to any authority that would support the proposition that because two or more employers could be found to have an "identity of interest" for purposes of EEOC notification, those entities should be considered an "integrated employer" for purposes of determining the numerosity requirement under Title VII.

In addition, Ms. Olvera-Morales apparently conceded that she would be unable to establish such a relationship between NCGA and ILMC when she failed to assert the "alter ego" argument that was contained in the Complaint and also anticipated by the Defendants in their summary judgment papers.  When this matter was pending before the Northern District of New York, counsel for Ms. Olvera-Morales indicated that in order to develop the alter ego theory he wanted to conduct discovery on issues such as whether NCGA and ILMC have (1) "followed the formalities required for corporate existence"; (2)"whether they are independently adequately capitalized"; (3) "whether there is intermingling of corporate funds with the principals' personal affairs"; (4) "the extent of intermingling of funds, assets and property between the two corporations"; (5) "the amount of business discretion displayed independently by the two

20

companies"; and (6) "the extent to which they are independent profit centers."

Olvera Morales, 322 F. Supp. 2d 211, 219 (N.D.N.Y. 2004). Ms. Olvera-Morales has not presented any evidence gleaned from this discovery. Therefore, the Court must conclude that Ms. Olvera-Morales would not be able to establish that NCGA and ILMC are alter ego entities or part of an "integrated enterprise."

In sum, the undisputed evidence before the Court demonstrates that during the relevant time period, ILMC did not have the requisite fifteen employees to subject it to Title VII liability. As such, ILMC's Motion for Summary Judgment as to the Title VII claims is GRANTED, and those claims are DISMISSED as to ILMC.

## C.

Defendants have also moved for summary judgment on the Title VII claims because they assert that any employment decisions made during the recruitment process were made while Ms. Olvera-Morales, a Mexican citizen, was in Mexico. Defendants assert that Title VII does not apply extraterritorially and thus does not apply to Ms. Olvera-Morales' individual and class discrimination claims regarding the recruitment process.[3]

In support of their arguments, Defendants rely primarily upon Reyes-Gaona v. N.C. Growers Ass'n, Inc., 250 F.3d 861 (4th Cir. 2001), in which the Fourth

---

[3]ILMC and NCGA concede that Title VII would be applicable to the individual Title VII claims that Ms. Olvera-Morales asserts with respect to any allegedly discriminatory conduct committed once she was working in the United States. [Defs. Reply Br. at 8 (explaining that the "'extraterritorial defense' applies only to the alleged discrimination that took place in Mexico")].

Circuit held that the Age Discrimination in Employment Act ("ADEA") was not applicable to a Mexican national who applied in Mexico for a job in the United States. Id. at 862. In Reyes-Gaona, a Mexican national man over the age of 40, went to a Del-Al office in Mexico seeking work in the United States through NCGA. Id. Mr. Reyes-Gaona was told that NCGA would not hire workers who were over the age of 40. Id. The Fourth Circuit held that Mr. Reyes-Gaona could not seek relief under the ADEA because "foreign nationals in foreign countries are not covered by the ADEA, regardless of whether they are seeking employment in the United States or elsewhere." Id. at 866-67. Defendants assert that Reyes-Gaona is dispositive of the issues in this case regarding Ms. Olvera-Morales' claims regarding recruitment.

The facts of Reyes-Gaona are distinguishable from the facts of this case in one primary respect, however. In Reyes-Gaona, the plaintiff applied for work in Mexico and was rejected in Mexico; he never worked in the United States. In this case, however, while Ms. Olvera-Morales was recruited in Mexico, she was eventually hired by a United States company and actually worked in the United States.[4] Therefore, the application of Title VII in this case would not constitute an

---

[4]On November 7, 2007, the Court entered an order granting Ms. Olvera-Morales' motion for class certification. [Doc. #123]. In the Memorandum Opinion accompanying that Order, the Court adopted the class definition proposed by Ms. Olvera-Morales of all female H-2B workers that were either "recruited, procured, or referred for employment by the Defendants or their agents." [Doc. # 122, at 11]. In light of Reyes-Gaona, it is necessary to clarify that the class includes only those individuals who actually entered the United States and worked in the United

22

unlawful extraterritorial application of the laws of the United States .

Defendants also make a related argument that because Ms. Olvera-Morales was not authorized to work in the United States at the time she was recruited in Mexico, she cannot establish that she was qualified for the position at the time of her application.  Defendants cite Egbuna v. Time-Life Libraries, Inc., 153 F.3d 184 (4th Cir.1998), and Chaudhry v. Mobil Oil Corp., 186 F.3d 502 (4th Cir.1999), in support of their arguments.  In Egbuna, the court dismissed a complaint by an illegal alien alleging discriminatory refusal to rehire him in the United States holding that the plaintiff was not qualified for the position within the meaning of Title VII because he was not authorized for employment in the United States.  Egbuna, 153 F.3d at 187.  Similarly, in Chaudhry the court dismissed the complaint of a foreign national employed outside the United States by a United States employer at the time of an alleged discriminatory denial of transfer to a position in United States on the grounds that because the plaintiff lacked documentation authorizing him for employment in the United States, he was not qualified under Title VII.  Chaudhry, 186 F.3d at 504-05.

Defendants raised this argument pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure before the Northern District of New York prior to the transfer of this case to this Court.   This Court agrees with the rationale of the Northern District of New York when it rejected Defendants' arguments at that

---

States.

time.  Specifically, Ms. Olvera-Morales, unlike the plaintiffs in <u>Egbuna</u> and

<u>Chaudhry</u>, sought assistance from these Defendants not only to obtain

employment in the United States but also to obtain the necessary documentation

and authorization so that she could begin working in the United States.  <u>Id.</u> at 220.

Thus, both parties anticipated that as a result of their efforts, Ms. Olvera-Morales

would be qualified to work in the United States.

Moreover, as the Northern District of New York observed, "a categorical

ruling that a foreign national has no protection against discriminatory hiring

practices simply because she applied to work in the United States a few days

before receiving INS documentation has the potential to invite abuse by employers

and to undermine the goals of Title VII."  <u>Id.</u> at 220 (noting that Ms. Olvera-

Morales applied for a position on July 20, 1999 and that her "I-94 Departure

Record was not approved and stamped by the Immigration and Naturalization

Service ("INS") until July 27, 1999."  Although the New York court made that

observation at the 12(b)(6) stage, the parties have not presented any evidence

obtained through discovery that would alter the wisdom of that court's decision.

### D.

Finally, Defendants have asserted that they are entitled to summary

judgment on Ms. Olvera-Morales' employment discrimination claims because she

has failed to create a genuine issue of material fact that she was discriminated

against because of her sex.

24

In support of her Title VII claims, Ms. Olvera-Morales has proffered the following. Ms. Olvera-Morales, and ten putative class members, have submitted affidavits stating that when they were recruited they were never told about the H-2A program, that they were qualified to perform H-2A work, and that they would have preferred to have an H-2A visa due to the benefits associated with that visa. Ms. Olvera-Morales has also testified to the same information in her deposition. Additionally, in the 30(b)(6) Deposition of Del-Al, Mr. Del Alamo testified that either NCGA or the Virginia Agricultural Growers Association told Del-Al that it preferred all-male crews in the fields. [Del-Al Dep. at 170-71].

NCGA has responded to Ms. Olvera-Morales' proffered evidence with the testimony of Mr. Eury that NCGA did not discriminate against women and that its members/clients did not specifically request male workers for particular jobs. NCGA also asserts that Ms. Olvera-Morales' deposition testimony could be interpreted as a statement that she was offered agricultural work. At best, this conflicting evidence creates a factual dispute and requires a determination of witness credibility, both of which are within the province of the jury.

In addition, Ms. Olvera-Morales has presented statistical evidence that fewer women were hired for H-2A positions than for H-2B positions. For example, ILMC placed 1,922 women in H-2B positions from 1999 through 2006, which represents 11.3% of the total 17,084 H-2B workers it placed. By contrast, the 2,084 women hired for H-2A positions by both ILMC and NCGA represents 2.2% of the total

25

93,872 H-2A workers they placed over the same time period.  Similarly, between

1999 and 2006, Del-Al processed 4,684 women for H-2B positions, which

represents 13.9% of the total 33,637 H-2B workers it processed.  The 1,040

women Del-Al processed for H-2A positions represents 2.1% of the total 48,619

H-2A workers it processed over that period.

NCGA has submitted the affidavit of Dr. Mary Dunn Baker, a labor

economist, to interpret these statistics.  Dr. Baker concludes that the percentage of

Mexican females working in H-2A and H-2B positions reflects the distribution of

females working like jobs in Mexico.  Ms. Olvera-Morales responded by submitting

the affidavit of Dr. David W. Griffin, a labor economist and statistician, who

concluded that the relied upon statistics provide strong evidence consistent with

the discrimination claim at issue in this case.  The interpretation of these statistics

and the credibility of these experts are issues that must be decided by the jury.

IV.

In the Complaint, Ms. Olvera-Morales also seeks relief under the New York

Human Rights Law ("NYHRL") for sex discrimination (Count IV) and aiding and

abetting discriminatory practices (Count V).  These claims are asserted on behalf of

Ms. Olvera-Morales and on behalf of the class members she represents.

Defendants have moved for summary judgment on the grounds that this Court

lacks subject matter jurisdiction to hear the NYHRL claims by asserting that the

NYHRL has no application to allegedly discriminatory acts committed by non-

resident employers outside the state of New York. The Defendants contend that because Ms. Olvera-Morales was recruited in Mexico and received her H-2B visa in Mexico, they did not commit any discriminatory acts in New York.

Ms. Olvera-Morales responds that although she was recruited in Mexico, she eventually worked, and was discriminated against, in New York. In support of her argument, Ms. Olvera-Morales cites a Northern District of New York case, which holds that in order for the NYHRL to apply, "a plaintiff need not allege that the discrimination originated in New York, if she alleges . . . that the discriminatory practice affected the conditions of her employment in New York." Wilcox v. PRC of New York Ltd. P'ship, No. 95CV1291, 1997 WL 141682, at *5 (N.D.N.Y. Mar. 24, 1997). In Wilcox, the plaintiff employee was a New York resident who worked in New York and who was subject to sexual harassment on a series of business trips that took place outside New York. Id. at *1. Ms. Olvera-Morales asserts that under Wilcox the NYHRL is applicable in this case because the discriminatory act of assigning her an H-2B visa ultimately affected the conditions of her employment in New York.

The NYHRL claims are currently before the Court pursuant to the supplemental jurisdiction statute. See 28 U.S.C. § 1367(a) (providing that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims within such original jurisdiction that they form part of the same case or

27

controversy"). In this case, there is no dispute that the NYHRL claims are "so related" to the Title VII claims that "they form part of the same case or controversy."

However, as the Supreme Court has explained, "to say that the terms of § 1367(a) authorize the district courts to exercise supplemental jurisdiction over state law claims . . . does not mean that the jurisdiction *must* be exercised in all cases." City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172 (1997). Rather, "district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons" and should "deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity . . . ." Id. at172-73 (citations omitted). In addition, by statute, a district court may decline supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(4).

In this case, Ms. Olvera-Morales seeks to have the NYHRL applied to non-New York defendants who recruited her in Mexico. At the time the defendants made their allegedly discriminatory decisions regarding Ms. Olvera-Morales, they did not know that she would eventually be employed in New York. In fact, when she was initially hired, Ms. Olvera-Morales was assigned to a plant in Michigan. As

28

noted above, the NYHRL has been held to apply to conduct outside the state that affects the conditions of employment in New York when the employee was employed in New York at the time the discriminatory conduct was committed. It is not clear, however, whether the New York courts would extend the application of the NYHRL to conduct that could eventually affect an individual in New York if at the time the conduct was committed the employee was not currently employed in New York and had no expectation of being employed in New York at that time. The parties have not cited to any New York case law that would apply the NYHRL in this circumstance.

Thus, the facts of this case appear to create a novel issue of state law regarding the application of the NYHRL that would best be decided by the New York courts. On these facts, and because it has been determined that neither Del-Al nor ILMC are appropriate defendants in the Title VII case, the Court declines to exercise supplemental jurisdiction over the NYHRL claims, and those claims are DISMISSED WITHOUT PREJUDICE.

V.

In sum, ILMC and NCGA's Motion for Summary Judgment [Doc. # 101] on the Title VII claims is GRANTED as to ILMC, and those claims are DISMISSED. ILMC and NCGA's Motion for Summary Judgment [Doc. # 101] on the Title VII claims is DENIED as to NCGA. Del-Al's Motion for Summary Judgment [Doc. # 98] as to the Title VII claims is GRANTED, and those claims are DISMISSED. The

Court declines to exercise supplemental jurisdiction over the New York Human

Rights Law claims, and those claims are DISMISSED WITHOUT PREJUDICE.

    This the day of January 1, 2008


                                                    <u>   /s/ N. Carlton Tilley, Jr.  </u>
                                                    United States District Judge